Cite as 2020 Ark. App. 51

# ARKANSAS COURT OF APPEALS

DIVISION III
**No.** CV-19-757

|  |  |
|---|---|
| | **Opinion Delivered** January 29, 2020 |
| CONSTANCE DAY AND NEMIAH GILLIAM<br>APPELLANTS | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, TENTH DIVISION<br>[NO. 60JV-19-571] |
| V. | |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD<br>APPELLEES | HONORABLE KATHLEEN BELL, JUDGE |
| | AFFIRMED |

## BRANDON J. HARRISON, Judge

Constance Day and Nemiah Gilliam appeal the circuit court's order that adjudicated their son, MG, dependent-neglected. On appeal, both parents argue that the circuit court erred in finding that the Arkansas Department of Human Services (DHS) engaged in reasonable efforts to prevent MG's removal. In addition, Gilliam argues that the evidence was insufficient to support a finding of dependency-neglect, or alternatively, that there was insufficient evidence that he was unfit or neglected his child. We affirm.

This family has a history with DHS dating back to 2006. Day and Gilliam, who are married but do not live together, have four other children who are currently in their maternal grandmother's custody pursuant to a guardianship. *See Gilliam v. Sanders*, 2013 Ark. App. 227 (affirming circuit court's granting of guardianship). The parties' fifth child, MG, was born in November 2018. Two weeks after his birth, DHS received a report of inadequate supervision, and on November 27, DHS exercised a seventy-two-hour hold "due to concerns about the

effect that Ms. Day's drug use has on her ability to parent." The hold was released on December 9 "due to Ms. Day being on a high dose of prescription methadone." At that time, DHS made a safe-care referral for Day.

On 9 January 2019, Chelsey Durden, the assigned family service worker, conducted a successful home visit. She observed that MG did not have appropriate bedding and that Day's speech was "a little slurred." Day had completed her intake for safe care. However, Durden was unable to locate Day five days later, and Day's whereabouts were unknown until March 21, when a social worker from Arkansas Children's Hospital (ACH) informed Durden that MG had been hospitalized since March 13. Durden was told that MG had been admitted for failure to thrive and that Day was currently hospitalized for a drug overdose. Durden obtained Day's medical records, which showed that she had been found partially unresponsive in the ACH parking lot and had been admitted for an overdose of methadone and clonazepam.

On March 25, MG was released from ACH, and Durden exercised a seventy-two-hour hold on him. The affidavit stated,

> The agency finds Ms. Day not capable of providing supervision or parental support for [MG] due to her drug usage and falling asleep during the care of [MG]. Ms. Day has demonstrated she cannot be an appropriate caretaker. Mr. Gilliam has not demonstrated he is willing to protect [MG] due to previous situations that have occurred with Ms. Day. [MG] was placed in a licensed foster approved foster home placement. I spoke with Mr. Gilliam regarding the care of [MG] and he stated he cannot medically take care of [MG].

On April 4, DHS released the hold on MG and implemented a protection plan for the agency to work with the family. That plan required that Day live with her sister, Tammy Hampton; that Hampton supervise Day and MG at all times; and that Day refrain from drug and alcohol use, continue to receive services from the methadone clinic, continue counseling

2

services, receive parenting classes, complete weekly home visits and random drug screens, and ensure that MG is attending medical appointments and getting proper feedings.

Day did not comply with the protection plan, however, and on April 26, Hampton asked that she be released from the protection plan "due to being harassed by Ms. Day." Day was given until April 28 to find another support system, but she failed to do so. Durden reported that Day became agitated and upset and said that "she does not care if [MG] goes into foster care." On April 30, DHS exercised a seventy-two-hour hold on MG, citing concerns over Day's mental state and substance abuse. MG was not released to Gilliam because he had expressed concern over his ability to care for MG and meet his medical needs.

On 3 May 2019, DHS petitioned for emergency custody and dependency-neglect of six-month-old MG. The affidavit attached to the petition for emergency custody identified the following safety-assessment factors in making the decision to remove MG:

> 6. Caretaker has not, cannot, or will not provide supervision necessary to protect the child from potentially dangerous harm.
>
> 7. Caretaker is not willing or unable to meet the child's need for food, clothing, shelter, and/or medical, health care.
>
> 11. Caretaker's current substance use seriously affects her ability to supervise, protect, and care for the child.

The affidavit also recited that reasonable efforts had been made by DHS to prevent removal from Day:

> On 12/9/2019 [sic] and 4/8/2018, a referral was made for parenting classes through Arkansas Children's Hospital Safe Care program. Ms. Day was non-compliant with services and has not made herself available for services. Drug treatment was not offered to Ms. Day due to Ms. Day's medication being prescribed to her at the time of her case opening. Ms. Day completed intake for Safe Care on 4/19/2019.

3

In the ex parte order for emergency custody, the circuit court found that DHS had made reasonable efforts to prevent MG's removal and specifically referenced referrals made for Day. At the probable-cause hearing held on May 9, Day explained that she and Gilliam had been separated for four or five years and did not live together, but she did stay with him occasionally. She said that she receives Social Security disability benefits for depression and anxiety and was prescribed Klonopin and Celexia. Day also stated that a man she knows as "L.A. Scales" is MG's biological father, not Gilliam. She agreed that she has a substance-abuse issue and had sought treatment at a methadone clinic. She insisted that she was capable of meeting MG's medical needs and keeping him safe.

Gilliam testified that he lives with a friend with dementia and works at Mexico Chiquito. He said that according to the protective-services plan, he was available to assist Day financially, with transportation to appointments, and "if she needed a break or relief." Gilliam stated that he believed he could take care of MG's needs.

In the probable-cause order, the circuit court found that DHS's custody remained necessary because MG "is medically fragile and needs to be with a parent who is willing and able to provide for all his needs. At this time, the Court determines that neither one of the parents can do that for the juvenile." The court also found that its previously made reasonable-efforts finding would stand. Day and Gilliam were ordered to cooperate with DHS and attend MG's medical appointments. The court also ordered Day and Gilliam to learn about MG's medical needs and how to take care of him "in anticipation that either one of them may get legal custody of the juvenile."

The circuit court convened an adjudication hearing on 12 June 2019. Dr. Liza Murray discussed MG's failure-to-thrive diagnosis and explained that he has difficulty taking large

4

volumes of formula, so he must have a modified diet to gain weight. She said that any caregiver for MG would have to follow a very strict dietary regimen, otherwise he would be at risk for continued malnutrition and poor developmental outcomes. Specifically regarding Day, Dr. Murray expressed concern that a caregiver who might be under the influence of substances would be unable to recognize the necessity of a strict regimen.

Chelsey Mitchell (formerly Durden) testified that she had participated in the protective-services case and that DHS had provided protective services to ensure that Day was adequately supervising MG. She agreed that the goal was to keep MG in the home and not require a removal. Mitchell acknowledged there were no specific allegations that Gilliam had contributed to the dependency-neglect, but when asked whether he could care for MG in April 2019, Gilliam said he "would have to think about it." He later expressed concern about not being able to adequately care for MG given his medical needs. Mitchell acknowledged she was unsure if Gilliam had been caring for MG at the time he was taken into care.

Mitchell also discussed Day's noncompliance with the protective-services plan. She explained that Day had completed her parenting assessment but did not complete parenting classes. Mitchell also said that Day had been discharged from a drug-treatment clinic on April 17 and that no additional drug-treatment services had been provided after that date. In addition, Mitchell agreed that the protective-services plan had not included psychological services. She also agreed that safe care was the only service that was really offered. Finally, Mitchell agreed that she had no evidence to support the first two safety-assessment factors listed in her affidavit and that at the time of removal, it had been four months since Day had been drug tested.

Hampton testified that Day spent only one night at her house, the night of April 4; Day then left MG in Hampton's care, stating that she (Day) was going through withdrawals and did

not want to go through that at Hampton's house. Hampton said that Day had been present when DHS home visits occurred.

From the bench, the court ruled that it would not disturb the previous finding that reasonable efforts had been made. The court also found MG dependent-neglected and stated,

> It's my finding that both parents are equally responsible for the care of this child and that both parents have equally failed and [are] responsible for this child's chronic malnutrition and failure to thrive. Just because the child was not in Mr. Gilliam's custody—physical custody does not relieve him of the responsibility to care.

The circuit court's written order found MG dependent-neglected due to neglect and parental unfitness by Day and Gilliam. The court also found that although Gilliam had expressed doubts about his ability to care for MG's medical needs, "[t]his does not absolve the legal father of some responsibility of caring for a juvenile that he knows has significant medical issues." The order also noted that Gilliam "does not want to participate in any services, other than visitation with the juvenile and paternity testing." The written order reiterated that the previous reasonable-efforts finding would stand. The court set the goal of the case as reunification with Day, with a concurrent goal of obtaining a permanent custodian, including permanent custody with a fit and willing relative. The court found that it was appropriate for Day and Gilliam to visit MG together and that the visitation would be supervised; if Gilliam visited without Day, it could be unsupervised. Both Day and Gilliam have timely appealed the adjudication order.

Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof. Ark. Code Ann. § 9-27-327(a)(1)(A) (Supp. 2019). A dependent-neglected juvenile is one at substantial risk of serious harm as the result of the following acts or omissions as to the juvenile, a sibling, or another juvenile: (i) abandonment, (ii) abuse, (iii) sexual abuse, (iv) sexual exploitation, (v) neglect, (vi) parental unfitness, or (vii) being present

6

in a dwelling or structure during the manufacturing of methamphetamine. *See* Ark. Code Ann. § 9-27-303(18)(A). "Neglect" includes those acts or omissions of a parent, guardian, or any person who is entrusted with the juvenile's care that constitute (1) a failure or refusal to provide the necessary food, clothing, shelter, or medical treatment necessary for the juvenile's well-being; or (2) failure to provide for the juvenile's care and maintenance, proper or necessary support, or medical, surgical, or other necessary care. Ark. Code Ann. § 9-27-303(36)(A)(ii) & (v).

Dependency-neglect allegations must be proved by a preponderance of the evidence. Ark. Code Ann. § 9-27-325(h)(2)(A)(2). We will not reverse the circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Wade v. Ark. Dep't of Human Servs.*, 337 Ark. 353, 990 S.W.2d 509 (1999). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* In reviewing a dependency-neglect adjudication, we defer to the circuit court's evaluation of the credibility of the witnesses. *Seago v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 767, 360 S.W.3d 733. In an adjudication hearing, the focus is on the child, not the parent; at this stage of a proceeding, the juvenile code is concerned with whether the child is dependent-neglected. *Id.* An adjudication of dependency-neglect occurs without reference to which parent committed the acts or omissions leading to the adjudication; the juvenile is simply dependent-neglected. *Albright v. Ark. Dep't of Human Servs.*, 97 Ark. App. 277, 248 S.W.3d 498 (2007).

I. *Reasonable Efforts*

Arkansas Code Annotated section 9-27-327, which governs adjudication hearings, provides that

> [u]nless the court finds that a removal occurred due to an emergency and the agency had no prior contact with the family or the child, evidence shall be presented to the court regarding all prior contact between the agency and the juvenile or the family before a finding of reasonable efforts to prevent removal by the department.

Ark. Code Ann. § 9-27-327(a)(2) (Supp. 2019). "Reasonable efforts" are defined as

> efforts to preserve the family before the placement of a child in foster care to prevent the need for removing the child from his or her home and efforts to reunify a family made after a child has been placed out of his or her home to make it possible for him or her to safely return home.

Ark. Code Ann. § 9-27-303(48)(A)(i).

Day asserts that because DHS had an open protective-services case with the family, it was required to present evidence of its reasonable efforts. She argues that despite the concerns raised about her substance abuse and psychological issues, DHS provided no services to address these issues that formed the basis for removal. She asserts that the only effort made by DHS was appointing a relative, Hampton, to supervise Day. She contends that "[t]here was absolutely no evidence offered to demonstrate what reasonable efforts DHS took to prevent the removal" of MG. Day asks that we reverse the case with an order to dismiss the emergency petition or, alternatively, that we reverse and order the circuit court to return MG to Day's custody while DHS provides the needed family services.

In his brief, Gilliam joins Day's argument as it relates to reasonable efforts. He also argues that "the Department did not involve him substantively in the protective services case and did not give him appropriate training on how to meet the juvenile's medical needs, so that he could have taken physical custody on April 30, 2019."

We need not address the arguments presented by Day and Gilliam because we hold that reasonable efforts were not necessary pursuant to Ark. Code Ann. § 9-27-335(e)(2)(C)(i) (Supp. 2019), which provides that the circuit court may transfer custody of a juvenile despite the lack

8

of reasonable efforts by DHS "if the transfer is necessary to protect the juvenile's health and safety." In this case, the circuit court found that MG's continued custody with DHS was "in the juvenile's best interests and necessary for the protection of the juvenile's health and safety" and that neither Day nor Gilliam could adequately protect MG's health and safety. Neither parent challenges those findings.

## II. *Adjudication*

Gilliam first argues that the evidence did not support a dependency-neglect finding. He notes that DHS offered no evidence of MG's weight prior to the April 30 hold, that no medical records were introduced, that Dr. Murray's testimony reflected MG's weight only after he entered foster care, that DHS failed to introduce any drug screens on either parent, and that DHS failed to call the home-health nurse as a witness. Gilliam contends that as the moving party, DHS was required to present proof that the allegations in the petition were substantiated, but by the caseworker's own testimony, she did not have specific evidence that was not hearsay. Thus, Gilliam argues that DHS failed to meet its burden of proof. Second, Gilliam argues that even if the evidence supports a finding of dependency-neglect as to Day's actions, there was no evidence that he was unfit or that he neglected MG, so this court should not "permit the findings to stand as they relate to Mr. Gilliam."

We hold that we are precluded from addressing Gilliam's sufficiency argument because Day conceded the sufficiency of the evidence supporting the adjudication. As noted above, dependency-neglect attaches to the child, not to a specific parent, and this court will not affirm the dependency-neglect finding as to Day but reverse it as to Gilliam. Further, we need not address Gilliam's argument as to his contribution or lack thereof to the dependency-neglect because a dependency-neglect adjudication occurs without reference to which parent

9

committed the acts or omissions leading to the adjudication; the juvenile is simply dependent–neglected. *Albright*, *supra*.

Affirmed.

GLADWIN and WHITEAKER, JJ., agree.

*Dusti Standridge*, for separate appellant Constance Day.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for separate appellant Nemiah Gilliam.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Chrestman Group, PLLC*, by: *Keith L. Chrestman*, attorney ad litem for minor child.