2012 Ark. App. 507

**Jasmine EASON, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES & Minor Child, Appellees.**

**No. CA 12–348.**

Court of Appeals of Arkansas.

Sept. 19, 2012.

Leah Lanford, Arkansas Public Defender Commission, for appellant.

Tabitha B. McNulty, Office of Chief Counsel, for appellee.

Bristow & Richardson, PLLC, by: Melissa B. Richardson, attorney ad litem for minor child.

DAVID M. GLOVER, Judge.

Jasmine Eason appeals from the February 9, 2012 order adjudicating her son, A.E., dependent-neglected. We affirm this fact-intensive case.

### Background regarding A.C.1 and A.C.2

Jasmine has three children: A.C.1, A.C.2, and A.E. A.E. (D.O.B.10–10–2011) is the child at issue in this appeal. In order to put the dependency-neglect proceedings regarding A.E. into context, it is necessary to know that ADHS previously filed a petition for emergency custody and dependency-neglect regarding A.C.1 and A.C.2 on June 18, 2010. The supporting affidavit for the earlier petition alleged that A.C.2 had been treated twice at Le Bonheur Children's Hospital in Memphis, Tennessee—the first time was at three weeks old for rib fractures, and the second time was at nine months old for "spiral fracture of the left tibia, multiple corner fractures of the distal femur and tibia along with multiple rib fractures." Jasmine and A.C.2's father, Antonius Collins, were named as the alleged offenders. During the investigation, it was discovered that Jasmine's mother, Minnie, actually had custody of A.C.1 at the time of A.C.2's injuries, but Jasmine and Antonius had access to both children. Minnie's custody of A.C.1 resulted from a juvenile-court order regarding Jasmine that was entered before A.C.2 was born. Both A.C.1 and A.C.2 were adjudicated dependent-neglected on August 19, 2010, without A.C.2's offender being determined. The dependency-neglect order was not appealed, and following a subsequent permanency-planning hearing, the trial court determined that the goal of the case should be changed to adoption because Jasmine's house had no utilities, it was still not known who caused A.C.2's injuries, and the children could not be safely returned to her care. The October 17, 2011 permanency-planning order was not appealed either.

### A.E.

Against that backdrop, Jasmine gave birth to A.E. on October 10, 2011. On October 12, 2011, A.E. was taken into emergency custody. The probable-cause hearing was held on October 18, 2011.

At the probable-cause hearing, Ashley Hunter, a family-service worker for Crittenden County Children and Family Services, testified that the seventy-two-hour hold was placed on A.E. because of the extensive injuries inflicted on his brother, A.C.2. She explained that there was an open case on Jasmine and on A.E.'s two siblings and that the case had been open since 2010. She said that the offender regarding A.C.2 had not been determined; that there had been an adjudication concerning the two siblings; and that they had not been returned to Jasmine. She testified that she was not alleging that any harm had been done to A.E., explaining that Jasmine had had very little contact with A.E. because he had been taken shortly after birth. She acknowledged that the injuries to A.C.2 were caused by an unknown offender but stated that she did not know that Jasmine was not the offender. She said that Jasmine had been cooperative with the agency over the past year and four months and that she had followed the conditions ordered by the court.

Hunter explained that several steps had been taken to try to determine whether Jasmine was the perpetrator concerning A.C.2's injuries, e.g., a psychological examination, which Jasmine took willingly, did not reveal any "axis one, axis two factors."

She acknowledged that she had nothing to show the court that would establish that Jasmine had harmed A.C.2 or A.E., but explained that they still took the hold on A.E. At the conclusion of the probable-cause hearing, the trial court reviewed the history concerning the two siblings and concluded that probable cause existed to protect A.E.

Then, on January 4, 2012, the dependency-neglect adjudication hearing was held. Bessie Collins, foster-care supervisor, testified that she was familiar with the history concerning A.E.'s two siblings and with A.E. She explained that DHS became involved with A.E. because of a hotline call soon after A.E.'s birth on October 10, 2011; and that A.E.'s two siblings, A.C.1 and A.C.2, had been in DHS custody since June 16, 2010, because A.C.2 had been admitted to Le Bonheur Children's Hospital twice with severe physical injuries before he was one year old. She testified that both A.C.1 and A.C.2 were taken into custody at that time; that there had been an adjudication in that case; and that the offender was listed as "no known offender." She said that DHS had worked with Jasmine since June 16, 2010; and that she had been allowed supervised, but not unsupervised, visits with A.C.1 and A.C.2 because of A.C.2's injuries and the fact that the offender had never been identified. She stated that at the time of A.E.'s birth, DHS determined that he could not remain in Jasmine's custody because his health and safety could not be guaranteed in light of the fact that there was still an unknown offender and because A.C.2's injuries had been serious. She said that it was DHS's recommendation that A.E. be found dependent-neglected and added to the current case of A.C.1 and A.C.2.

On cross-examination, Collins acknowledged that Jasmine had denied harming A.C.2 and that she had no information that Jasmine had harmed A.E. She testified that Jasmine had completed all of the conditions ordered by the trial court and was currently undergoing anger-management counseling. She further stated that a psychological examination had not revealed any significant issues concerning Jasmine's ability to care for the children, and that Jasmine had been gainfully employed throughout the case. Collins acknowledged that Jasmine's home setting had been adequate; that she had stable employment, income, and housing; and that neither drugs nor alcohol had ever been an issue in the case. She explained that her resistance to having the children returned to Jasmine was because the perpetrator of the abuse toward A.C.2 was still unknown. She testified that her perspective on the DHS recommendation was that as long as Jasmine continued to say she didn't know who hurt her child, she could not regain custody. She expressed her belief that Jasmine knew who had hurt A.C.2 and that Jasmine would protect a third party over her children.

Jasmine testified that Antonius Collins was A.E.'s father but that he could not sign the birth certificate because he was incarcerated at the time of A.E.'s birth. She stated that she had done everything she was required to do under the court orders. She acknowledged that the trial court had already made the finding that she had failed to protect A.C.2 and that she felt like she had failed to protect A.C.2 but that she "protected him the best [she] could." She explained that she

> was under age and in her mother's household until she put us out, but other than that, I couldn't take A.C.2 where I wanted to take him or do anything like that 'cause I couldn't—I could barely take care of him at the time. It wasn't just my mother at her house, it was my mother, me, my two sisters, and her

husband. Her husband is Deundre Bobo. All I know about him is he's my mother's husband. Really, like. He has a criminal history. He had drug charges and stuff like that.

She further stated, "I do feel like I had failed my kids because, if for one I couldn't take care of them I shouldn't have had them young but I knew I didn't do anything. I know I didn't choose nobody over them . . . ." She explained that she had prepared a bedroom for A.E. to come home to; that she had everything ready for him; and that she wanted him in her care. Jasmine stated that she did not put anybody above her kids and that if she knew who had harmed A.C.2 she would have already told DHS. She told the court that she was twenty years old and that she lived alone.

The guardian ad litem's recommendation was that A.E. remain in DHS's legal custody; that the court make a finding of dependency-neglect based on the findings in the prior case regarding the extensive, life-threatening injuries to one of A.E.'s siblings; and that the goal of the case be set as adoption. The DHS attorney stated that the Department was in agreement with the ad litem.

In explaining its decision finding A.E. dependent-neglected, the trial court reviewed the history of the case and A.C.2's injuries, emphasizing the pediatrician's testimony from prior hearings involving A.C.1 and A.C.2 concerning the nature and seriousness of A.C.2's injuries and the fact that they were aged or staggered, i.e., that the nature and aging of the injuries put the parties on notice that the abuse was on-going and had occurred over a period of time. The court acknowledged that it did not know who caused the injuries to A.C.2, but that in weighing all of the facts and circumstances it was going to enter a finding of dependency-neglect regarding A.E. "based on the physical abuse to a sibling,

A.C.2 . . . and based on the Court's previous two findings of August 19, 2010, at the adjudication hearing and the Court's finding of June 7, 2011, at the permanency-planning hearing [and also] based on inadequate supervision by the mother, as found back on August 19, 2010." The trial court then set adoption as the goal for A.E. The dependency-neglect order was filed on February 9, 2012. It is this order regarding A.E. that Jasmine appeals here.

### Decision

The essence of Jasmine's argument on appeal is "whether the abuse or neglect of one sibling automatically results in a finding of dependency-neglect for the other siblings, without regard to evidence of parental involvement."

As this court explained in *Lipscomb v. Arkansas Department of Human Services*, 2010 Ark. App. 257, 2010 WL 961547:

An adjudication order in a dependency-neglect proceeding is an appealable order. Ark. Sup.Ct. R. 6–9(a)(1)(a) (2009). In dependency-neglect cases, the standard of review on appeal is de novo, but we do not reverse the judge's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Moiser v. Arkansas Dep't of Human Servs.*, 95 Ark.App. 32, 233 S.W.3d 172 (2006). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id.*

In reviewing a dependency-neglect adjudication, we defer to the circuit court's evaluation of the credibility of the witnesses. *Seago v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 767, 360 S.W.3d 733. In this case, we are not left with a definite and firm conviction that the trial court made a

mistake in finding A.E. to be dependent-neglected.

Arkansas Code Annotated section 9–27–303(18) (Supp.2011) provides in pertinent part:

(18)(A) "Dependent-neglected juvenile" means any juvenile who is at substantial risk of serious harm as a result of the following acts or omissions to the juvenile, *a sibling,* or another juvenile: (i) Abandonment; (ii) Abuse; (iii) Sexual abuse; (iv) Sexual exploitation; (v) Neglect; (vi) Parental unfitness; or (vii) Being present in a dwelling or structure during the manufacturing of methamphetamine with the knowledge of his or her parent, guardian, or custodian.

(Emphasis added.) Section 9–27–303(36) provides in pertinent part:

(36)(A) "Neglect" *means those acts or omissions of a parent,* guardian, custodian, foster parent, or any person who is entrusted with the juvenile's care by a parent, custodian, guardian, or foster parent, including, but not limited to, an agent or employee of a public or private residential home, child care facility, public or private school, or any person legally responsible under state law for the juvenile's welfare, *that constitute:*

(i) *Failure or refusal to prevent the abuse of the juvenile when the person knows or has reasonable cause to know the juvenile is or has been abused;*

. . .

(iii) *Failure to take reasonable action to protect the juvenile from* abandonment, *abuse,* sexual abuse, sexual exploitation, neglect, or parental unfitness *when the existence of this condition was known or should have been known;*

. . .

(vii) *Failure to appropriately supervise* the juvenile that results in the juvenile's being left alone at an inappropriate age or in inappropriate circumstances, *creating a dangerous situation or a situation that puts the juvenile at risk of harm.*

(Emphasis added.) The focus of an adjudication hearing is on the child, not the parent. *Seago, supra.* At this stage of a proceeding, the juvenile code is concerned with whether the child is dependent-neglected. *Id.* An adjudication of dependency-neglect occurs without reference to which parent committed the acts or omissions leading to the adjudication; the juvenile is simply dependent-neglected. *Id.*

Here, although every official involved in this case acknowledged that they did not know who inflicted the injuries on A.C.2, it was undeniable that medical evidence had previously established that serious injuries had been inflicted on him, that the injuries were inflicted over time, and that the injuries had required hospitalization on two occasions-once when A.C.2 was only three weeks old (rib fractures) and then again when he was nine months old ("spiral fracture of the left tibia, multiple corner fractures of the distal femur and tibia along with multiple rib fractures"). The trial court had adjudicated both A.C.2 and A.C.1 dependent-neglected based on the injuries, the fact that Jasmine, at a minimum, should have been put on notice that abuse was occurring because of the extent of the injuries, and the fact that, in light of those circumstances, there existed a substantial risk of harm to both A.C.2 and A.C.1. A subsequent permanency-planning determination changed the goal with respect to these siblings from reunification to adoption. Neither the dependency-neglect nor the permanency-planning orders were appealed by Jasmine. The case was still open when Jasmine gave birth to A.E.

Thus, in hearing the case for dependency-neglect concerning A.E., the trial court was faced with the uncontested prior finding that A.C.2 had been abused, even though the offender was unknown. Our case law and code, as quoted above, support a trial court's finding of dependency-neglect for any sibling of a child who has suffered neglect or abuse, i.e., the abuse or neglect of one sibling can establish that another sibling is at substantial risk of serious harm—even though there is no reason to think that the other siblings have also been actually abused or neglected. *See, e.g., Brewer v. Ark. Dep't of Human Servs.*, 71 Ark.App. 364, 43 S.W.3d 196 (2001). It is the risk of harm that is created by the sibling's abuse or neglect that makes a finding of dependency-neglect regarding the other sibling appropriate. The trial court did not make an "automatic" finding of dependency-neglect, as argued by Jasmine. Rather, it conducted a hearing and also reviewed the history of A.E.'s two siblings, particularly the medical evidence concerning A.C.2's injuries and the extent to which Jasmine should have been put on notice by those injuries that A.C.2 was being abused. That is, even if Jasmine was not doing the actual abusing, she had a duty to be aware of such abuse and to protect her children from it. Failing to do so with A.C.2 also provided the basis for a dependency-neglect finding regarding A.C.1, neither of which determinations were appealed, and A.E. was born while those cases were still open. In fact, one of the DHS witnesses expressed the belief that Jasmine knew who abused A.C.2, but put her children's interests second. Jasmine denied such knowledge, but the trial court was not obligated to believe her.

Even though it was never determined that Jasmine was the actual offender regarding A.C.2's injuries, those injuries still occurred—two hospitalizations, both of which occurred when A.C.2 was under the age of one. In addition, they occurred over time and to an extent that either put Jasmine on notice, or should have put her on notice, that abuse was occurring. Under the circumstances of this case, A.E.'s birth while the cases were still open regarding his two siblings leaves us without a firm or definite conviction that the trial court erred in also finding A.E. to be at substantial risk of harm, even though Jasmine was complying with court orders. The trial court's finding of dependency-neglect was simply not "automatic." It came after a full and complete hearing on this issue and a consideration of all of the circumstances surrounding the case.

Affirmed.

VAUGHT, C.J., and MARTIN, J., agree.