RITA W. GRUBER, Chief Judge
Charity Allen-Grace appeals from the Washington County Circuit Court's order adjudicating her three children-A.S. (01/22/04), A.G.1 (10/09/09), and A.G.2 (09/18/12)-dependent-neglected. On appeal, appellant argues that the evidence was insufficient to support the court's finding that the children were dependent-neglected. We affirm.
On June 17, 2017, the Arkansas Department of Human Services (DHS) exercised a 72-hour hold on appellant's three children. On June 20, 2017, DHS filed a petition for emergency custody and dependency-neglect, and an order for emergency custody was entered the same day. A probable-cause hearing was held on June 22, 2017. The trial court found that probable cause existed to issue the ex parte order and continued to exist, making it necessary for the children to remain in the custody of DHS. On July 24, 2017, the trial court entered an order placing A.G.1 and A.G.2 in the legal custody of their paternal grandparents, Joann and Albert Grace. An adjudication hearing was held on July 26, 2017.
This case originated when the police were called to investigate a domestic disturbance on June 16, 2017, involving appellant and A.S. Springdale police officer Jacob Enos testified that A.S.'s physical appearance concerned him because she had a large swelling on her nose and under her eye. He spoke with A.S. about what happened and felt her story was credible. Officer Enos testified that during the investigation, appellant was arrested on the charge of third-degree domestic battery involving A.S. Later, he saw appellant at the jail, and although he did not speak to her, he testified that she appeared to be very intoxicated based on his observation.
*207 Stephanie Graham, the DHS investigator, began an investigation after receiving a call from the hotline that a priority-one referral was received for threat of harm, which included striking a child with a closed fist; striking a child age seven or older in the face or head; and cuts, bruises, or welts. The alleged victim was A.S. Graham interviewed appellant and A.S. on June 17, 2017, the day after the alleged disturbance. She noted that she did not see A.G.1 and A.G.2 during her investigation.[1] She testified that when she interviewed A.S. at a neighbor's home, A.S. had raised, red welts on the bridge of her nose and near her left eye. A.S. stated that appellant had punched her in the face and hit her with a candle. According to the affidavit in support of the petition for emergency custody,
A.S. reported that appellant was intoxicated. Graham spoke to appellant at her home, and appellant denied she had done anything and had no explanation for A.S.'s injuries.
Photographs of A.S.'s injuries, as well pictures of the home, were introduced into evidence. Graham testified that there were boxes and things scattered throughout the house. She indicated that the photo of appellant's bedroom showed a beer bottle on the nightstand, a mostly empty six-pack container and two open bottles, and cigarettes. She testified that there was broken glass, broken items, and garbage on the floor of A.S.'s bedroom. She stated that the house was very messy and unsanitary, elaborating that there was dried dog urine and feces inside the home. Graham noted that there was not much food in the home. As a result of the investigation, DHS found true against appellant for the offense of cuts, bruises, and welts; striking a child age seven or older on the face or head; and striking a child with a closed fist, with A.S. as the victim. When questioned about prior DHS involvement with the family, Graham stated the history went back to 2008. There was a true finding against Matthew Steed,[2] A.S.'s legal father, for sexual abuse naming A.S. as the victim, as well as two investigations involving appellant, one for neglect and one for abuse, both of which were unsubstantiated.
The DHS caseworker, Haley Mehan, testified that A.G.1 and A.G.2 were in the legal custody of Joanne and Albert Grace, their paternal grandparents. She did not have any problem with their father living in the home, although he had pending methamphetamine charges, based on her observations when visiting the home. She indicated A.G.1 and A.G.2 were thriving and happy to be there. Mehan recommended that appellant's visitation continue at one hour per week. She explained that A.S. remained in the custody of DHS and was placed provisionally with her paternal grandparents, Leslie and Peter Halpern. She also indicated that A.S. was doing well and that appellant had no contact with A.S. due to the criminal charge. In addition, Mehan testified that she had spoken with Steed, who lives in Colorado, and he did not ask to be present by phone for the adjudication. She recommended that he have no face-to-face contact with A.S.
Alan Grace[3] testified that while he was married to appellant, appellant was violent toward A.S. and that he had intervened on several occasions. He stated appellant would strike her, call her names, and verbally abuse her. He testified that appellant would get intoxicated on a regular basis and expressed concern about her prescribed anxiety medications, which included *208 Xanax. He stated that he had concerns about A.G.1 and A.G.2 being in her home. He acknowledged having two pending drug charges for possession of methamphetamine, one in Missouri and one in Benton County, which prompted a revocation of probation for a possession-of-methamphetamine offense.
Leslie Halpern, A.S.'s paternal grandmother, testified that A.S. was doing well in her home. Mrs. Halpern also stated that A.S. was in counseling.
Appellant testified that she had lived in Springdale her whole life except for one year when she lived in Siloam Springs. She stated that she was a teacher and had a master's degree in special education. On June 16, 2017, appellant was still moving back to
Springdale from Siloam Springs. She testified that since her divorce from Alan Grace, which she believed was in 2014, she had problems getting along with A.S. She stated that A.S. began self-harming (cutting), threatening suicide, threatening to run away, and stealing. She testified that A.S. also became violent with her and her sisters; she would throw things and break things. Appellant explained that when they moved to Siloam Springs, A.S. overdosed on Xanax and was evaluated at Tulsa Pediatric Hospital, where she stayed for three or four days.
Appellant explained that A.S.'s behavior worsened when they moved back to Springdale from Siloam Springs. The night of the altercation leading to her arrest, appellant noticed two fresh cuts on A.S.'s arms, prompting her to call Vantage Point that evening. She did a mobile assessment and Vantage Point scheduled a 10:00 appointment the next day to see A.S. because A.S. had been self-harming again, taking Xanax, and smoking. Appellant described the cutting as extreme cuts, resulting in scarring up and down both arms. Appellant stated that the appointment led to the altercation. She testified that A.S. began yelling and cussing at her, kicking things, packing her room, and threatening to run away. She elaborated that A.S. threatened to hit herself, call the police, have her arrested, and ruin her life and career. Appellant denied striking A.S. but stated that A.S. hit her several times trying to get appellant's phone.
She explained that the photographs of her home showed boxes and trash because they were cleaning up from the previous renters. She also stated that when she left her home upon arrest on June 16, it did not look like it did in the pictures taken by the caseworker on June 17. When she returned home from jail on June 17, she discovered her house was not locked, and her dogs had been left inside and they were not in their cages. The boxes and things in the pictures were not the way she had left them. She indicated that things had been gone through and thrown about. Her car keys, wallet, credit cards, bank cards, check books, and some prescription medications were missing. At the hearing, appellant introduced current photos of her home, showing cleaner conditions.
Appellant also testified that she found a suicide note in her daughter's room after the DHS investigator left. The note was written to A.S.'s boyfriend. She explained that A.S. was very upset about moving to Springdale because her boyfriend lived in Siloam Springs. She believed A.S. wrote the note because it was in A.S.'s handwriting and she found it in A.S.'s room. Appellant acknowledged that she has prescriptions for a muscle relaxer, Xanax, and Ambien, but stated that she takes the muscle relaxer and Ambien only as needed. In 2017, appellant had two arrests-one for misdemeanor assault in March 2017 with A.S. being the alleged victim and the one in June 2017 that led to the adjudication.
*209 In addition, there was a 2017 citation for misdemeanor assault against Alan Grace.
Appellant testified that she did not obtain counseling for A.S. because it was not recommended, explaining that she did several mobile assessments that "came out clear." Appellant testified that A.S. had been homeschooled for a period when they were in Siloam Springs. She explained that A.S. returned to school after she overdosed but had missed a lot of school. A.S. began homeschooling because her ex-fiancé's son, who had passed away, attended the same school as A.S. Appellant testified that A.S. did not want to return to school because he went to the same school. She talked to A.S. about counseling but never made an appointment, stating that A.S. refused to go. Appellant testified that since the case was opened, she had completed different parenting classes, alcohol-and-substance-abuse classes, as well as an anger-management class. She added that she did not think she had an alcohol problem and had not consumed alcohol since the night of her arrest.
A.S. testified at the hearing that things were going great with her grandparents. She stated that she did not write the suicide note her mom claimed she had written. She testified that she was at the pediatric hospital in Tulsa the year before, and she denied overdosing or taking any medication to cause her to be hospitalized as appellant claimed. A.S. did not know why she went to the hospital, only recalling that her mom hit her; she went to her room and took a nap, and she was in the hospital for four days. She testified that she did not go to counseling before or after she was hospitalized and that her mom did not schedule counseling appointments that she refused to attend.
In its written order entered on July 26, 2017, the court found A.S., A.G.1, and A.G.2 to be dependent-neglected. The court found by clear and convincing evidence[4] that the children were dependent-neglected upon finding they were at substantial risk of harm as a result of neglect, parental unfitness, and abuse as to A.S. Specifically, the court found that appellant physically abused A.S., that appellant's home was unsanitary, and that appellant was not meeting A.S.'s mental-health needs.
Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof. See Ark. Code Ann. § 9-27-327(a)(1)(A) (Repl. 2015). Dependency-neglect allegations must be proved by a preponderance of the evidence. Ark. Code Ann. § 9-27-325(h)(2)(B). We will not reverse the trial court's findings unless they are clearly erroneous. Maynard v. Ark. Dep't of Human Servs. , 2011 Ark. App. 82, at 6, 389 S.W.3d 627, 630. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. Ark. Dep't of Human Servs. v. Walker , 2016 Ark. App. 203, at 2, 489 S.W.3d 214, 216. In reviewing a dependency-neglect adjudication, we defer to the trial court's evaluation of the credibility of the witnesses. Id.
Arkansas Code Annotated section 9-27-303(18)(A) (Repl. 2015) provides:
(18)(A) "Dependent-neglected juvenile" means any juvenile who is at substantial risk of serious harm as a result of the following acts or omissions to the juvenile, a sibling, or another juvenile:
*210 (i) Abandonment; (ii) Abuse; (iii) Sexual abuse; (iv) Sexual exploitation; (v) Neglect; (vi) Parental unfitness; or (vii) Being present in a dwelling or structure during the manufacturing of methamphetamine with the knowledge of his or her parent, guardian, or custodian.
Abuse, as defined in section 9-27-303(3)(A), includes when a parent is repeatedly cruel to a juvenile, causes non-accidental physical injury, and strikes a child on the face without justification and causes injury. Section 9-27-303(36) provides in pertinent part:
(36)(A) "Neglect" means those acts or omissions of a parent, guardian, custodian, foster parent, or any person who is entrusted with the juvenile's care by a parent, custodian, guardian, or foster parent, including, but not limited to, an agent or employee of a public or private residential home, child care facility, public or private school, or any person legally responsible under state law for the juvenile's welfare, that constitute:
(iv) Failure or irremediable inability to provide for the essential and necessary physical, mental, or emotional needs of the juvenile, including failure to provide a shelter that does not pose a risk to the health or safety of the juvenile;
Ark. Code Ann. § 9-27-303(36)(A)(iv).
On appeal, appellant challenges the sufficiency of the evidence. She addresses her argument with respect to A.G.1 and A.G.2 separately from her argument as to A.S. We will address appellant's argument as to A.S. first. She contends that there was insufficient evidence to support the court's finding of dependency-neglect based on abuse, neglect, and parental unfitness. We disagree.
The testimony at the adjudication hearing established that the police were called to a domestic disturbance between appellant and A.S. on June 16, 2017. Officer Enos spoke with A.S. about what happened and observed swelling on her nose and under her eye. Officer Enos testified that appellant appeared to be intoxicated. Graham, the DHS investigator who interviewed appellant and A.S., observed that A.S. had raised red welts on the bridge of her nose and near her left eye. She testified that A.S. stated that appellant had punched her in the face and hit her with a candle. Graham spoke to appellant, who denied she had done anything and had no explanation for A.S.'s injuries. Graham testified that the home was messy and unsanitary, noting broken glass, garbage, dog urine, and dog feces inside the home.
Alan Grace testified that while he was married to appellant, appellant was violent toward A.S. and would strike her, call her names, and verbally abuse her. He also testified that appellant would regularly get intoxicated.
Additionally, appellant testified that she had been arrested for assaulting A.S. approximately three months before DHS took emergency custody of her children and had one citation in 2017 for assault of Alan Grace. Appellant also admitted having prescriptions for Xanax, Ambien, and a muscle relaxer. Appellant testified that A.S. had been acting out for three years and was self-harming, threatening suicide, threatening to run away, stealing, and becoming violent by breaking and throwing things. Appellant testified that A.S. overdosed on Xanax, which resulted in a three-day stay at Tulsa Pediatric Hospital. Despite A.S.'s ongoing behavior, appellant did not obtain counseling for A.S., explaining that A.S. refused to go or that it was not recommended after mobile assessments "came out clear."
While appellant denied that she had struck A.S. in the incident that led DHS to *211 take custody of A.S., the trial court found appellant was not credible and found A.S. to be credible. In addition, she attributes the condition of her home at the time of the incident with A.S. to the previous renters and alleges that someone entered her home the night she was arrested and her dogs were left inside. Appellant claims that there was no evidence from a mental-health professional that A.S. needed therapy and points to the fact that the only testimony on this issue comes from her and the trial court found her not to be credible.
We defer to the trial court's determinations of witness credibility. Ark. Dep't of Human Servs. v. Walker , 2016 Ark. App. 203, at 2, 489 S.W.3d 214, 216. This court is not to act as a "super factfinder," substituting its own judgment or second-guessing the credibility determinations of the court; we reverse only in those cases where a definite mistake has occurred. Harris v. Ark. Dep't of Human Servs. , 2015 Ark. App. 508, at 7, 470 S.W.3d 316, 320. Based on these facts, we cannot say that a mistake has been made.
Appellant also argues that there is insufficient evidence to support the finding that A.G.1 and A.G.2 were dependent-neglected, specifically contending there was no evidence that A.G.1 and A.G.2 were dependent-neglected. Appellant suggests that while the evidence and the adjudication order detailed a "tumultuous relationship" between her and A.S., the issues of their relationship do not mean A.G.1 and A.G.2 were at a substantial risk of harm. She points to her own testimony that she never had issues with A.G.1 and A.G.2 as she did with A.S.
Our case law and statute, as quoted above, support a trial court's finding of dependency-neglect for any sibling of a child who has suffered neglect or abuse. Eason v. Ark. Dep't of Human Servs. , 2012 Ark. App. 507, at 9, 423 S.W.3d 138, 143. The abuse or neglect of one sibling can establish that another sibling is at a substantial risk of serious harm, even when there is no reason to think that the other siblings have also been actually abused or neglected. Id. (citing
Brewer v. Ark. Dep't of Human Servs. , 71 Ark. App. 364, 43 S.W.3d 196 (2001) ). It is the risk of harm that is created by the sibling's abuse or neglect that makes a finding of dependency-neglect regarding the other sibling appropriate. Id. In Brewer , we explained:
Parental unfitness is not necessarily predicated upon the parent's causing some direct injury to the child in question. Such a construction of the law would fly in the face of the General Assembly's expressed purpose of protecting dependent-neglected children and making those children's health and safety the juvenile code's paramount concern. To require Logan to suffer the same fate as his older sister before obtaining the protection of the state would be tragic and cruel.
71 Ark. App. at 368, 43 S.W.3d at 199.
In addition to the true finding of abuse of A.S., there was also evidence of neglect and parental unfitness, which was discussed previously. When considering all the evidence in this case, we cannot say that the trial court's finding A.G.1 and A.G.2 to be dependent-neglected is clearly against the preponderance of the evidence. Also, we are not left with a firm conviction that a mistake has been committed. Therefore, we affirm the trial court's adjudication order.
Affirmed.
Harrison and Glover, JJ., agree.

A.G.1 and A.G.2 were with their legal father, Alan Grace, for summer visitation.

Matthew Steed is not a party to this appeal.

Alan Grace is not a party to this appeal.

Although the trial court made its findings by clear and convincing evidence, only proof by a preponderance of the evidence is necessary in an adjudication hearing. Ark. Code Ann. § 9-27-325(h)(2)(B) (Repl. 2015).