BRANDON J. HARRISON, Judge
Charity Allen-Grace appeals the termination of her parental rights to her three children-A.S., A.G.1, and A.G.2. On appeal, she argues that there was insufficient evidence to support the court's best-interest determination. We affirm.
I. Background
In February 2018, we affirmed the Washington County Circuit Court's determination that A.S., A.G.1, and A.G.2. were dependent-neglected. Allen-Grace v. Ark. Dep't of Human Servs. , 2018 Ark. App. 83, 542 S.W.3d 205. In April 2018, the circuit court entered a permanency-planning order. It found that Charity had complied partially with the case plan by maintaining contact with DHS, maintaining a safe and clean home, and staying employed. The court, however, also found that Charity stopped submitting to random drug screens, failed to complete individual counseling, and was arrested for sexually assaulting A.S.'s boyfriend, a minor. Charity also had a previous misdemeanor-assault charge with A.S. as the victim. The court further found that Charity married Kenneth Shaw, a prisoner in Missouri. The court noted that the juveniles were being cared for by relatives and termination of parental rights was in the children's best interest. The court ordered Charity to cooperate with DHS, complete a psychological evaluation, abstain from illegal drugs or alcohol, not abuse prescription drugs, submit to random drug screens twice a month, and "demonstrate ability to protect juveniles and keep them safe from harm," among other things. In May 2018, the Arkansas Department of Human Services (DHS) filed a petition to terminate Charity's parental rights.
The circuit court convened hearings on DHS's termination petition on 1 August, 14 September, and 4 October 2018. The parties presented the prior orders in the case, a court report, A.S.'s counseling report, a court appointed special advocate (CASA) report, a visitation log, and a letter from Charity to the circuit court. The evidence showed that Charity owns a house in Springdale, which a CASA worker observed to be "clean, safe, and appropriate," that Charity's marriage to Kenneth Shaw was annulled in June 2018, and that Charity works as an accountant for a tile store.
After the children were initially removed from their mother's custody, the circuit court placed custody of A.S. with her paternal *399 grandparents Peter Halpern and Leslie Halpern and custody of A.G.1 and A.G.2 with their paternal grandparents, Joanne Grace and Albert Grace. By all accounts, the children were doing well living with their paternal grandparents. A.S., A.G.1, and A.G.2 had monthly sibling visits. The DHS visitation log showed that Charity attended almost all weekly visits with the children from 6 July 2017 to 2 October 2018.
According to DHS's drug-screen log for Charity, she had a "verified prescription for Xanax" and tested positive for "BZO" on more than one occasion. Charity failed to show up for four of the thirteen scheduled drug tests from April to September 2018.
A.G.1 and A.G.2's therapist, Kimberly Elliott, testified that she believed it would be detrimental to the girls' mental health for the court to return custody of the children to Charity. This was because of the traumas experienced by the girls when they were with Charity. In her opinion, the girls have a "very insecure attachment" to each other because of the instability in their lives. Elliott diagnosed A.G.1 with adjustment disorder with anxiety and A.G.2 with other-specified-trauma-related disorder. She said that A.G.1 was "working out in her mind" why Charity would be in bed all day or have slurred speech. And A.G. 2 was piecing together that "Mom's put bad things in her body, so her mind doesn't work the same[.]" In short, Charity had substance-misuse issues that were apparent to her children.
Therapist Jessica Kitchens testified that A.S. had been diagnosed with posttraumatic stress disorder. According to Kitchens, it would set back A.S. "tremendously" to return to her mother. Returning custody to Charity would be harmful to A.S.'s mental health because she would not feel safe. In Kitchens's view, A.S.'s living with the Halperns has helped A.S. feel safe and has been a calm environment for her.
Caseworker Kari Horton testified that A.S. wanted to be adopted by the Halperns and that she was thriving in their care. A.S.'s father, Matthew Steed,[1] was supportive of his parents adopting A.S. In Horton's opinion, Charity had kept DHS informed throughout the case, had maintained stable housing and employment, had submitted to random drug screens, had demonstrated sobriety, and had visited the children consistently. Charity, however, had not resolved her criminal charges.
Horton further testified that there were true findings against Charity of striking a child with her fist, striking a child on the head or face, sexual contact, sexual exposure, pornography and exposure to live sex acts, and indecent exposure. She also said that Charity had not followed the recommendations of the psychological evaluation and that she did not successfully complete her individual counseling. No documentation of criminal charges or a psychological evaluation were accepted as evidence. On cross-examination, Horton could not say the dates of the true findings other than they were in November 2017.
DHS's position, according to Horton, was that adoption by the children's grandparents would give them more permanency than a permanent-custody situation. In Horton's opinion, it was best for Charity's parental rights to be terminated, and the children were adoptable. A.G.1 and A.G.2 were very bonded to their grandfather, and he was their primary caregiver.
Charity testified during the termination hearings. Among other things, Charity said that she had completed ten individual counseling sessions and that DHS had refused *400 to pay for more sessions. Charity testified that she was ready to accept the children into her home and that she works full time, pays all her bills, and owns her car. Charity expressed concern that she had not been able to see A.S. for more than a year and that Mr. Halpern had made several threats against her (Charity) and had tried to undermine her at work and get her fired. Charity expressed concern that A.S. is using illegal drugs. Importantly, she admitted that the criminal charges against her had not yet been resolved. She also said the criminal allegations involving A.S.'s boyfriend did not emerge until after A.S. was in the Halperns' custody.
On cross-examination and redirect, Charity told the court that she had been arrested for a DWI in Missouri, that she refused to blow for the test, and that her blood test at the police station was negative so the criminal charges had been dropped. The court at one point stated that Charity had "pled no contest," and Charity responded that she paid a fine. It is not clear from the exchange what, exactly, the court and Charity were discussing.
Alan Grace testified that A.G.1 and A.G.2 receive $ 300-$ 350 from the government based on Alan's disability. Alan's father, Albert Grace, testified that the girls had lived in his home since June 2017 and that if the court decided to terminate Alan and Charity's parental rights, he and his wife are willing and able to adopt A.G.1 and A.G.2. On cross-examination, Albert stated that he was sixty-seven years old and his wife was sixty-six years old and that if they either received permanent custody or adopted the girls that they would take care of them. He also said that he and his wife have enough income and that they used the disability payments to get what the girls needed. But he also stated that the disability payments were not necessary to take care of the girls and that he did not think that the court should deny the termination petition so that the girls could still receive the disability payments. Joanne Grace testified that she, too, thought the children should be adopted because it would give them more stability.
At the end of the termination hearings, which had been spread out over several days over the course of several weeks, Horton testified that Charity failed to show up at a court-ordered closure visit with A.S. It is undisputed that Charity informed Horton that she would not be attending. Horton communicated to the court on October 4 that A.S. was upset that Charity did not appear. Charity replied that there was a no-contact order in place so that is why she could not attend the visit.
The circuit court entered an order terminating Charity Allen-Grace's, Alan Grace's, and Matthew Steed's parental rights as to A.S., A.G.1, and A.G.2 on 31 October 2018. Charity has appealed that order.
II. Discussion
We review termination-of-parental-rights cases de novo. Cheney v. Ark. Dep't of Human Servs. , 2012 Ark. App. 209, 396 S.W.3d 272. But we will not reverse the circuit court's ruling unless its findings are clearly erroneous. Id. A finding is clearly erroneous when, although there is evidence to support it, we are left with a definite and firm conviction that a mistake has been made. Id. In determining whether a finding is clearly erroneous, we give due deference to the opportunity of the circuit court to assess the witnesses' credibility. Id.
A circuit court's order that terminates parental rights must be based on clear and convincing evidence.
*401 Dinkins v. Ark. Dep't of Human Servs. , 344 Ark. 207, 40 S.W.3d 286 (2001). Clear and convincing evidence is that degree of proof that will produce in the fact-finder a firm conviction that the allegation has been established. Pratt v. Ark. Dep't of Human Servs. , 2012 Ark. App. 399, 413 S.W.3d 261. Proof of only one statutory ground is sufficient to terminate parental rights. Gossett v. Ark. Dep't of Human Servs. , 2010 Ark. App. 240, 374 S.W.3d 205. A circuit court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) -(ii) (Supp. 2017).
Here, Charity challenges only the circuit court's best-interest determination. She first argues that the circuit court failed to consider the effect the termination decision would have on the future sibling relationship between A.S., A.G.1, and A.G.2. She also argues that permanent custody was a less restrictive alternative to termination. Third, she argues that the age of the grandparents (the Graces) "diminished the likelihood that they could raise a 6-year-old and a 9-year-old until the age of majority without assistance" and that by terminating parental rights, A.G.1 and A.G.2 are deprived of the disability income from their father. Charity argues that three siblings will become strangers to each other should this court allow the termination to stand. The circuit court, she argues, erred by failing to consider this impact of termination on the sibling relationships. Charity does not contest that her three children are adoptable.
The circuit court found that the juveniles would be at a substantial risk of serious harm if they were returned to Charity because she "still has pending criminal charges" and "Mother's choices throughout the case have continued to demonstrate that she cannot make her children a priority[.]"
We hold that the circuit court did not err in finding that termination of Charity's parental rights was in her children's best interest. The circuit court must consider a parent's compliance and behavior during the entire dependency-neglect case as well as the evidence presented at the termination hearing to decide whether the termination is in the children's best interest. Ark. Code Ann. § 9-27-341(a)(4)(B) (Supp. 2017). Here, the case began because Charity hit A.S. in the face and appeared to be intoxicated when police officers arrived. Allen-Grace v. Ark. Dep't of Human Servs. , 2018 Ark. App. 83, at 10, 542 S.W.3d 205, 210. During the dependency-neglect case, Charity was criminally charged for abusing A.S.'s boyfriend and that allegation had not been resolved by the termination hearing. The court heard evidence about other arrests and true findings against Charity. The children's therapists, the CASA volunteer, and the DHS caseworker all agreed at the termination hearing that the children would be at risk of harm if placed with Charity. Charity failed to appear for several drug tests, and she had a history of substance misuse. This is all evidence of the potential for future harm, which makes the court's best-interest finding not clearly erroneous.
As for Charity's argument regarding termination and the impact it has on the children's financial situation and relationship, we affirm. When making its best-interest analysis, the circuit court considers the children individually when determining whether termination is in *402 each child's best interest and cannot treat the children as an amorphous group in which the best interest of one will meet the interests of all. Black v. Ark. Dep't of Human Servs. , 2018 Ark. App. 518, at 7, 565 S.W.3d 518, 523. Keeping siblings together is an important consideration but not outcome determinative, as the best interest of each child is the polestar consideration. Ark. Dep't of Human Servs. v. Couch , 38 Ark. App. 165, 169, 832 S.W.2d 265, 268 (1992) (noting that some siblings have special needs and there are situations in which one child would be in danger from the other or one would be neglected because of the other). The intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3).
Here, the children had been living with their respective paternal grandparents for more than one year. By all accounts, the children were deeply bonded to the grandparents as their primary caregivers, and the grandparents were taking excellent care of them. The CASA volunteer, the caseworker, and the children's therapists all recommended that the children stay where they had been throughout the case. There was nothing to indicate that the grandparents would not allow the siblings to keep visiting as they had throughout the dependency-neglect case. At the termination hearing, the court determined that the children were still at risk of harm from Charity.
Importantly, Charity was the only parent to appeal the termination order. The grandparents caring for the children in this case have rights derivative of the children's fathers Matthew Steed and Alan Grace. Charity lacks standing to challenge that a termination deprives the girls of disability income or that the termination of the fathers' rights affects the grandparents' ability to care for the children. See Cole v. Ark. Dep't of Human Servs. , 2018 Ark. App. 121, at 7, 543 S.W.3d 540, 544. The court's fact-based conclusion in its termination order that it was in A.S.'s best interest to be adopted by the Halperns and in A.G.1's and A.G.2's best interest to be adopted by the Graces is not clearly erroneous under the circumstances.
We affirm the termination of Charity Allen-Grace's parental rights.
Affirmed.
Gruber, C.J., and Abramson, J., agree.

Steed's parental rights were also terminated, but he has not appealed the termination.