BRANDON J. HARRISON, Judge
Katlyn Bales appeals the circuit court's order that adjudicated her children dependent-neglected. On appeal, she argues that the circuit court erred in (1) adjudicating the children dependent-neglected, (2) continuing custody of the children with the Department of Human Services (DHS), and (3) finding that DHS engaged in reasonable efforts to prevent removal. We affirm.
On 18 September 2017, DHS filed for emergency custody of two-month-old N.M. and thirteen-month-old A.S. The accompanying affidavit explained that on September 12, the Scott County Department of Children and Family Services (DCFS) received a referral concerning N.M., who was underweight. N.M. weighed 8 pounds, 11 ounces at birth, and two months later weighed 9 pounds, 4 ounces. Bales told medical staff that N.M. was under a doctor's care, but N.M.'s pediatrician had not seen him since the birth. Bales also missed a follow-up visit with a nutritionist on September 11. The affidavit noted that DCFS had an open protective-services (PS) case with Bales for environmental-neglect issues. Since the PS case had been opened, Bales, her boyfriend, and the two *499 children had moved in with Bales's maternal grandparents, the Skinners, but DCFS was still conducting random drug screens and random home visits. According to the affidavit, Bales had agreed to notify DCFS if there were any changes in her living arrangements.
On the morning of September 13, several family service workers arrived at the Skinner residence to speak with Bales and observe the children. Mr. Skinner told them that Bales and the children were not there, he did not know where they were, and he would have Bales call when she returned. Forty-five minutes later, Bales called DCFS and stated that she had relocated to Oklahoma, had been living with a friend for several days, and had a job at Subway. Later in the conversation, however, she said that she had moved to Oklahoma to be with a boyfriend, that she was no longer employed at Subway, and that she was worried about not having a place to live. She asked DCFS to drive to Oklahoma to visit the children, but they refused, so Bales said she would find a ride back to Arkansas. Mr. Skinner drove to Oklahoma to pick up Bales and the children, and they arrived at the DCFS office at approximately 7:00 p.m. DCFS placed a seventy-two-hour hold on the children over "concerns for the children's health and safety due to the mother, Katlyn Bales, not having a stable home environment, not providing adequate food and medical neglect with [N.M.]." The affidavit also listed a lengthy maltreatment history involving Bales, including multiple incidents in which Bales was the alleged victim and either her mother (Tina Bales) or one of her grandparents (the Skinners) were the alleged offenders. There were also reports of inadequate food and environmental neglect from 2016 and 2017 listing Bales as the alleged offender.
The circuit court ordered emergency custody of the children and, by stipulation, found probable cause to continue custody with DHS on September 25. The court ordered Bales to watch the "Clock is Ticking" video, attend and complete parenting classes, obtain stable and appropriate housing, obtain and maintain stable and gainful employment, submit to a psychological evaluation, attend counseling, submit to homemaker services, and otherwise cooperate with DHS and comply with the case plan. The court also allowed visitation at the discretion of DHS.
The circuit court convened an adjudication hearing on November 7. Ashley Mickle, a nutritionist with the Arkansas Department of Health WIC program, testified that she had an appointment with Bales and N.M. on September 6. At that time, Mickle said, the baby weighed 9 pounds, 4 ounces, "wasn't growing very well," and was gaining weight at an approximate rate of 0.2 ounces per day. She said a normal weight-gain rate would be approximately 1.0 ounce per day. Bales told Mickle that she was feeding N.M. formula, 16 ounces a day, and Mickle told Bales that was a low amount and asked her to keep a food log of what he was eating. Mickle scheduled a follow-up visit for September 11, but Bales did not appear, and Bales told a nurse that she had moved to Poteau, Oklahoma.
After reviewing hospital records, Mickle said that N.M. was seen in the Mercy Hospital emergency room on August 5 for thrush and weighed 9 pounds at that time. The notes from that visit state that the baby was "dirty, smells of rotten milk, and stale urine. Mother with strong body odor as well." The notes also state that N.M. "was breast feed [sic] until a few days ago when she switched him to formula." Records indicated another emergency room visit on September 13, the day N.M. was taken into DHS custody, "due to concern about failure to thrive coupled with *500 mother not taking child to PCP for eval." On that day, the baby weighed 10 pounds, 0.3 ounces. Finally, records from an appointment at Sparks Hospital indicated that the baby weighed 10.93 pounds on September 25. Mickle said that the baby had been weighed the day before the hearing and that he weighed 11 pounds, 14 ounces, which is a healthy weight gain since September 6.
On cross-examination, Mickle said she was not given any medical diagnosis to explain why the child was not gaining weight. She acknowledged that between September 6 and September 13, the day that DHS took N.M. into custody, the baby had gained approximately 12 ounces, which was an appropriate weight gain. Mickle agreed that the weight gain occurred while N.M. was in Bales's care and that if Bales had attended the September 11 appointment, Mickle's concern for the baby would have been alleviated. She also agreed that a nurse at the WIC office had first seen N.M. on August 22, which meant that Bales had started seeking food assistance around six weeks after N.M.'s birth.
Julie Kishiyama, the Scott County DCFS supervisor, testified that a PS case was opened with the family after they received a report that "the mother and father were not keeping the house very clean for the child, for [A.S.] and for the brand-new baby, and there were chickens living in the bathroom." Caseworkers began visiting Bales weekly at her home in the Bristol Square Apartments. At some point, Bales moved in with her grandparents, and Kishiyama and two caseworkers attempted to visit her there on September 13. When Kishiyama finally saw Bales at approximately 7:00 p.m. on September 13, Bales told her that she had been seeing Dr. Cheshier, the baby's pediatrician, and that he had said there were "medical issues" causing N.M. to not gain weight. Bales did not specify what those medical issues were. Kishiyama had already contacted Dr. Cheshier's office and knew that the doctor had not seen N.M. since his birth. Kishiyama accused Bales of not being honest and placed the children on a seventy-two-hour hold.
On cross-examination, Kishiyama explained that DCFS felt comfortable with Bales and the children living with her grandparents but that they still planned to conduct home visits. DCFS told Bales and the grandparents that if the living arrangement changed, DCFS should be notified. Kishiyama acknowledged there was no court order requiring Bales to notify DCFS if she moved. She explained that when she exercised the hold, her biggest concern was not the baby's weight but Bales's relocation to Poteau and the inconsistencies in Bales's explanations for the move and the baby's doctor's visits. She agreed that Bales had taken N.M. to get all his medically recommended shots, that she had taken him to WIC, that she had taken him to the emergency room when he had thrush, and that the last week he was with her he had gained more than the recommended amount of weight. She also agreed that she had no reason to restrict Bales's right to travel or move to Oklahoma. Finally, she agreed that, as part of the PS case, DCFS could have provided assistance for N.M.'s medical needs, but Kishiyama said Bales never requested that type of assistance. Upon being questioned by the court, Kishiyama said that Bales had complied with the PS case by cleaning the home. Kishiyama also noted an inadequate-food report made in August 2016, after A.S. was born, and two environmental-neglect reports made in February and April 2017.
Bales testified that she currently lives with her mother and her grandparents. She said that N.M. was anemic when he was born and that she had breastfed him *501 for his first two months until DHS took him. She claimed that she had been harassed by DHS since February 2017 and that she had never had chickens in her home. She said that she had visited friends in Oklahoma and considered staying there but had never moved there. She acknowledged that she had missed the September 11 appointment with the nutritionist but said that she called and said she was in Oklahoma at the time.
On cross-examination, Bales said that she had cared for N.M. from September 6 to September 13 and that he had gained weight during that time because she switched to formula. She also said that DHS had not offered her any services to help with N.M.'s feeding or his medical appointments. She stated that she was ready, willing, and able to have her children placed with her. She explained that she had only had three visits with her children because DHS had failed to call her to set up visitations. She said that she had called Kishiyama every day for the past two months trying to set up visitation.
After DHS rested, Bales moved to dismiss the dependency-neglect petition because "[t]hey have not shown that the child is so dependent-neglected that they need to be removed from the custody of the mother. They have not shown that the mother is unfit and can't have custody of the children." The motion was denied.
Don Skinner, Bales's grandfather, testified that Bales currently lives with him and had lived with him on and off since A.S. had been born. He testified that he had no concerns about Bales's parenting and that he was available to transport Bales and the children to and from medical appointments. He also said that Bales had just visited Oklahoma with the children and that she was not moving there.
Connie Skinner, Bales's grandmother, testified that her home was "open and ready" for the two children if the court dismissed the dependency-neglect petition. She also said that she had no concerns about the children being with Bales. Regarding the evening that DHS exercised a hold on the children, Connie testified that Kishiyama told her that DHS needed one more drug test and that "if Katlyn came to the office everything would have been finished." Upon being questioned by the court, Connie said that Bales did not currently have a job but that Don receives around $5,000 a month from retirement and disability.
The circuit court ruled from the bench that DHS had met its burden of proving that the children are dependent-neglected. The court's written order, entered 22 November 2017, found that the children
are dependent-neglected due to neglect as defined in the Arkansas Juvenile Code. The Court finds specifically that [N.M.] failed to thrive due to the deficiency of food because the mother, Katlyn Bales, was not adequately feeding him and he hardly gained weight. The Court also found that Katlyn and her children, [N.M.] and [A.S.], had an unstable environment and investigations this year for inadequate food in the home and environmental neglect.
Bales has now appealed this order.
Adjudication hearings are held to determine whether the allegations in a petition are substantiated by the proof. Ark. Code Ann. § 9-27-327(a)(1)(A) (Supp. 2017). A dependent-neglected juvenile is one at substantial risk of serious harm as the result of the following acts or omissions as to the juvenile, a sibling, or another juvenile: (i) abandonment, (ii) abuse, (iii) sexual abuse, (iv) sexual exploitation, (v) neglect, (vi) parental unfitness, or (vii) being present in a dwelling or structure during the manufacturing of methamphetamine. Ark. Code Ann. § 9-27-303(18)(A) (Supp. 2017). "Neglect" is defined, in part, as acts or *502 omissions of a parent that constitute "[f]ailure or refusal to provide the necessary food, clothing, shelter, or medical treatment necessary for the juvenile's well-being, except when the failure or refusal is caused primarily by the financial inability of the person legally responsible and no services for relief have been offered[.]" Ark. Code Ann. § 9-27-303(36)(A)(ii).
Dependency-neglect allegations must be proved by a preponderance of the evidence. Ark. Code Ann. § 9-27-325(h)(2)(A). We will not reverse the circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. See Wade v. Ark. Dep't of Human Servs. , 337 Ark. 353, 990 S.W.2d 509 (1999). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. Id. In reviewing a dependency-neglect adjudication, we defer to the circuit court's evaluation of the credibility of the witnesses. Seago v. Ark. Dep't of Human Servs. , 2009 Ark. App. 767, 360 S.W.3d 733. And in an adjudication hearing, the focus is on the child, not the parent; at this stage of a proceeding, the juvenile code is concerned with whether the child is dependent-neglected. Id.
I. Adjudication
DHS removed the children from Bales due to lack of a stable home environment, not providing adequate food, and medical neglect of N.M. In finding the children dependent-neglected due to neglect, the circuit court cited three supporting factors: (1) N.M.'s failure to thrive due to inadequate feeding, (2) unstable home environment, and (3) previous investigations for inadequate food and environmental neglect. On appeal, Bales challenges each of these factors, beginning with failure to thrive.
Bales first notes that N.M. was never diagnosed with failure to thrive and that Kishiyama admitted that during the PS case, DHS had no concern about inadequate food for N.M. Bales contends that the only evidence of inadequate feeding was N.M.'s slow weight gain during his first two months, but after Bales visited with the nutritionist and switched to formula, N.M. began to gain weight appropriately. Bales asserts that N.M. was also anemic, as documented by the emergency room notes from September 13, which noted "mild anemia." Bales also argues that any general claim of medical neglect is likewise unsupported, because even assuming that she made inconsistent statements about N.M.'s pediatrician visits, a credibility determination as to a parent cannot substitute or invalidate the substantive evidence offered at the adjudication hearing. See Guthrey v. Ark. Dep't of Human Servs. , 2017 Ark. App. 19, 510 S.W.3d 793 (holding that lack of credibility is not, in and of itself, a condition warranting removal of one's children and therefore does not amount to the failure to remedy such a condition). Bales concludes that
while [her] inconsistencies might call into question her believability as a witness, any questionable statements do not supplant the fact that at the time the Department exercised emergency custody of these children, [N.M.] was gaining an appropriate amount of weight, Katlyn had addressed his medical needs by making sure he was up-to-date on his vaccinations, by taking him to nutrition appoint[ment]s, and by seeking medical care when the child developed thrush. There was simply no evidence to support the trial court's determination that [N.M.] was suffering from failure-to-thrive or that [N.M.] had been subjected to medical neglect.
The attorney ad litem, on the other hand, presents a much different picture.
*503 According to the ad litem, "troubling events" began one month after N.M.'s birth, when Bales took him to the emergency room for thrush, and the medical records noted that N.M. was dirty and smelled like rotten milk and stale urine. The next month, at the nutritionist appointment, Mickle was concerned about N.M.'s lack of weight gain, counseled Bales about how and what to feed the baby, and scheduled a follow-up appointment. But Bales skipped the scheduled appointment and instead traveled out-of-state with the children. The ad litem acknowledges that Bales testified N.M. was anemic and that she was just visiting friends in Oklahoma but argues that the circuit court was not required to believe her self-serving testimony. The ad litem concludes that a preponderance of the evidence showed that "Bales was incapable of ensuring that N.M.'s basic, primary needs will be met."
DHS echoes the ad litem's argument and notes Bales's "lack of candor," particularly on the topic of whether N.M. was on breast milk or formula for his first two months. DHS denies that Bales's lack of credibility is an improper consideration for the circuit court and argues that her "lack of candor regarding [N.M.]'s eating habits created a serious safety risk as to what [N.M.] was eating and whether it was enough."
We hold that the circuit court did not clearly err in finding neglect based on a failure to thrive caused by inadequate feeding. Contrary to Bales's assertion, the inconsistencies and contradictions surrounding what she was feeding N.M. and how much she was feeding him are proper considerations when evaluating N.M.'s well-being. The Guthrey case cited by Bales is distinguishable; in that case, which involved a termination of parental rights, the circuit court found that "poor judgment" was the cause of the children's removal and that the mother had not remedied that condition, and we held that defining the cause of removal in that way was too vague and was unsupported by the evidence. Here, Bales's lack of credibility is not the root of the neglect finding; instead, it pertains to the material question of whether Bales was providing N.M. with the necessary food. Based on this record, we are not left with a definite and firm conviction that a mistake has been committed; therefore, we affirm the circuit court's finding of dependency-neglect. Because we affirm the finding of neglect based on failure to thrive, we need not address the other factors cited by the circuit court. See Beeckman v. Ark. Dep't of Human Servs. , 2015 Ark. App. 192, 2015 WL 1275932 (holding that the circuit court did not err in adjudicating the Beeckman children dependent-neglected due to abuse and finding it unnecessary to address the circuit court's findings of neglect and parental unfitness).
II. Continued Custody with DHS
In its order, the circuit court found that continuation of custody with DHS was in the best interests of the children. For her second point, Bales asserts that even if DHS proved that the children are dependent-neglected, it was error for the circuit court to continue custody with DHS when a less-restrictive alternative, placement with her, was in the children's best interest. In response, both DHS and the attorney ad litem argue that the circuit court's custody order is a disposition order that cannot be appealed absent an Arkansas Civil Procedure Rule 54(b) certification.
A review of the record shows that after the circuit court found the children dependent-neglected, Bales never requested that the children be placed with her in lieu of continued placement with DHS. A party is bound by the scope of his or her arguments made to the circuit court, *504 and we will not address arguments made for the first time on appeal. See Sills v. Ark. Dep't of Human Servs. , 2018 Ark. App. 9, 538 S.W.3d 249. In addition, DHS and the attorney ad litem are correct that the circuit court's custody disposition is not appealable without a proper Rule 54(b) certification. In Walker v. Arkansas Department of Human Services , 2017 Ark. App. 627, at 10-11, 534 S.W.3d 184, we explained:
[P]ursuant to Arkansas Supreme Court Rule 6-9(a)(1)(B), disposition, review, and permanency-planning orders are appealable only if the court enters an order in compliance with Arkansas Rule of Civil Procedure 54(b). Thus, not every order entered in a dependency-neglect case can be immediately appealed. See Schubert v. Ark. Dep't of Human Servs. , 2009 Ark. 596, 357 S.W.3d 458. As in this case, the trial court in Stoliker v. Arkansas Department of Human Services , 2012 Ark. App. 415, 422 S.W.3d 123, filed an "adjudication and disposition order." Although we addressed a challenge to Stoliker's arguments on appeal regarding the adjudication, finding his child dependent-neglected, we explained that we were unable to address his arguments regarding the disposition. Id. Stoliker had argued that the court's failure to reunify his child with him and placing custody with the child's mother was in error. Id. We explained that issues regarding a trial court's disposition are not properly before us under Rule 6-9(a)(1)(B) in the absence of a Rule 54(b) certification. Stoliker, supra. Because the order here does not include a Rule 54(b) certificate, the disposition findings are not final and appealable.
Likewise, we have no Rule 54(b) certification in this case, so the circuit court's disposition is not final and appealable.
III. Reasonable Efforts
At the adjudication hearing, after the court announced its finding that the children are dependent-neglected, Bales asked for a finding of no reasonable efforts, to which the court responded, "I'm not going to do that. We're-this is the adjudication. We'll have a review in about three months. I'm not going to do a no reasonable efforts at this time." In the adjudication order, the court made the following findings:
4. The Court finds that the Department exercised a 72-hour hold on September 13, 2017, because of immediate danger to the health or physical well-being of the juveniles, [A.S.] and [N.M.]. The first contact of the Arkansas Department of Human Services arose during an emergency where immediate action was necessary to protect the health, safety and welfare of the juveniles and where preventive services could not be provided, specifically, [N.M], who is a newborn infant, has not gained much weight since birth and the mother, Katlyn has [an] unstable home, therefore the Arkansas Department of Human Services is deemed to have made reasonable efforts to prevent or eliminate the need for removing the juveniles from the juveniles' home.
....
7. This case was thoroughly reviewed by this Court on this date and the juveniles, [A.S.] and [N.M.], are in need of the services of the Arkansas Department of Human Services. Return to the custody of the parent is contrary to the welfare of the juveniles and continuation of custody in the Arkansas Department of Human Services is in the best interests of and necessary to the protection of the juveniles' health and safety.
*505 Arkansas Code Annotated section 9-27-327, which governs adjudication hearings, provides that
[u]nless the court finds that a removal occurred due to an emergency and the agency had no prior contact with the family or the child, evidence shall be presented to the court regarding all prior contact between the agency and the juvenile or the family before a finding of reasonable efforts to prevent removal by the department.
Ark. Code Ann. § 9-27-327(a)(2). In this case, Bales argues that because DHS had prior contact with the family, DHS was required to present evidence of its reasonable efforts. But, she asserts, the evidence offered by DHS on this issue was "conclusory" and that DHS's limited efforts, consisting of home visits, concerned only the environmental-neglect issue. She concludes that "[t]here was absolutely no evidence offered to demonstrate what reasonable efforts the Department took to prevent the removal of these children."
The ad litem counters that a dependency-neglect adjudication does not require a reasonable-efforts finding. The ad litem also cites section 9-27-335(e)(2)(C)(i), which provides that the circuit court may transfer custody of a juvenile despite the lack of reasonable efforts by DHS "if the transfer is necessary to protect the juvenile's health and safety." In this case, the ad litem argues, the circuit court found that continued custody with DHS was "in the best interests of and necessary to the protection of the juveniles' health and safety." Thus, even assuming that the court's reasonable-efforts finding was erroneous, this court can affirm. The ad litem cites Walker, supra , which also dealt with this issue:
Arkansas Code Annotated section 9-27-327(a)(2) provides that at the adjudication hearing, "[u]nless the court finds that a removal occurred due to an emergency and the agency had no prior contact with the family or the child, evidence shall be presented to the court regarding all prior contact between the agency and the juvenile or the family before a finding of reasonable efforts to prevent removal by the Department of Human Services." In her brief, appellant argues that because DHS had prior contact with appellant and the children, the emergency exception to allow the trial court to deem that reasonable efforts were made does not apply and that DHS was required to present evidence of its reasonable efforts. Appellant further argues that DHS failed to provide critical services that would have prevented the removal of her children.
....
DHS concedes that the emergency exception was not applicable because the agency's first contact with the family was not at the time of removal. However, DHS argues that the trial court's findings should still be affirmed. First, the trial court's finding that reasonable efforts were made to prevent the need for removal of the children is not clearly erroneous. Collins specifically testified that one of the purposes of parenting classes is to provide safe and appropriate discipline techniques but that appellant failed to take advantage of those services. Moreover, even if the trial court did not find that reasonable efforts had been made, Arkansas Code Annotated section 9-27-335(e)(2)(C) still would have allowed the trial court to remove the children and transfer custody to DHS "despite the lack of reasonable efforts by the department to prevent the need for out-of-home placement if the transfer is necessary ... to protect the juvenile's health and safety." Here, the trial court specifically found in its order that "continuation of custody in the Arkansas Department of Human Services is in the best interests of and necessary *506 to the protection of the juvenile's health and safety." Because we cannot hold that these findings were clearly erroneous, we affirm on this point.
2017 Ark. App. 627, at 8-9, 534 S.W.3d at 189-90. The ad litem argues that we should likewise hold that the circuit court did not err in finding that DHS custody was necessary for the children's health and safety and, consequently, affirm the circuit court's order.
DHS argues that it made reasonable efforts to deliver services prior to removal, but even if it did not, removal was appropriate to protect the children's health and safety. Also citing Walker , DHS contends that even if this court finds insufficient evidence of reasonable efforts, we should still affirm "because the circuit court made an explicit finding that removal was necessary to protect A.S.['s] and [N.M.]'s health and safety."
Following Walker 's precedent, we hold that because the circuit court found that continuation of custody with DHS was in the best interests of and necessary to the protection of the children's health and safety, reasonable efforts were not required.
Affirmed.
Gruber, C.J., and Brown, J., agree.